**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

————————————————

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                              No. 23-cr-01843-KWR

SABAS ENRIQUE SALOMON-CASTRO,

        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court upon Defendant Sabas Enrique Salomon-Castro's motion to suppress. Doc. 46. Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is not well taken, and therefore, is **DENIED**.

## BACKGROUND

On November 25, 2023, New Mexico State Police Officer Julian Armijo ("Armijo") stopped a Toyota Camry for speeding. Doc. 97 at 10:23–11:14 (Armijo hearing transcript). Armijo observed the car travelling 9 miles over the speed limit. *Id*. He activated his lights and initiated a traffic stop. *Id*.

Armijo approached the passenger window and observed Defendant Salomon-Castro (the driver) and Samuel Astorga-Urias (the passenger and co-defendant). Doc. 97 at 11:15–12:7. He informed Defendant that he was speeding and asked for his driver's license, registration, and insurance. Ex. B at 2 (transcription and translation of Armijo bodycam footage).[1] Armijo then

---

[1] The transcription and translation of dialogue contained in the bodycam footage was provided by a certified staff interpreter for the Federal Public Defender's Office. Ex. B at 1. Both parties rely

asked whether Defendant spoke English or Spanish, and after Defendant stated the latter, Armijo

spoke Spanish for the remainder of the stop.[2] Doc. 97 at 12:10–12:19; Ex. B at 2. Armijo re-asked

for papers and informed Defendant that he was only issuing a warning. Ex. B at 2. After receiving

several documents, Armijo asked Defendant to join him in the patrol car. Ex. B at 2–3; Ex. A at

3:05 (Armijo bodycam video).

Once inside the patrol car, Armijo began filling out a written warning. Ex. A at 3:40. As

he was doing this, he began asking Defendant questions. Ex. B at 3. Armijo asked Defendant where

he was traveling:

> Q (Armijo): Where are we going from to?
> A (Defendant): New Mexico.
> Q: Where in New Mexico?
> A: Up ahead here.
> . . .
> Q: But, I don't know where here in New Mexico?
> A: Excuse me?
> Q: Don't, I don't know where here in New Mexico?
> A: What do you mean?
> Q: Here in New Mexico, where? Where work?
> A: Oh, no, up ahead, well, New Mexico.
> Q: Where?
> A: No, well, excuse me [unintelligible] the location, you know.

*Id.* at 3. Armijo then asked Defendant why he was traveling to New Mexico and for how long:

> Q: Why I go to . . . New Mexico?
> A: Uh, we're going to work.
> Q: Work. Where?
> A: Well we just contra-, this [unintelligible] and one, we're going to do carpeting.
> Q: Okay. For how many days work?
> A: Well, I think it's a month.

---

on the bodycam footage translation in their briefing and neither object to its admissibility. *See* Doc.
97 at 4:16–4:23.

[2] As will be clear from translated excerpts below, Armijo's Spanish is unexceptional. In Armijo's
own words: "My Spanish is not great, but it's not terrible . . .  I'm able to get my point across, and
I understand what is being told to me." Doc. 97 at 13:12–13:14.

*Id.* at 3–4. Armijo continued to ask about where exactly in New Mexico he was going to visit, yet Defendant failed to provide a specific destination. *Id.* at 4. Armijo then inquired about Defendant's passenger:

> Q: What is the other person in the car?
> . . .
> A: A work mate.
> Q: What is his name?
> A: Samuel.
> Q: Samuel what?
> A: Uh, I couldn't tell you. A work mate.
> Q: How long do I know him?
> A: Well, at work, it's been like a month, knowing each other.

*Id*. at 4–5.

At some point, Armijo learned that the Camry had a temporary registration and was registered to a third party who was not present in the vehicle. Ex. E. Armijo asked the Defendant if the car belonged to him, and Defendant responded by saying that the car belonged to his brother, whose stated name matched the registration. Ex. B at 5.

After additional questioning regarding his whereabouts and some small talk, Armijo told Defendant that he needed to check the Camry's VIN number. Ex. B at 8; Ex. A at 10:25. After exiting the patrol car, Armijo approached the front of the Camry and compared the registration to the dashboard VIN. Ex. A at 10:26–10:45. He proceeded to open the driver side door and inspect the doorjamb VIN for a few seconds, Ex. A at 10:46–10:51, before beginning to question the passenger, who was still seated in the Camry. Ex. A at 10:49. Armijo continued to inspect the VIN while questioning the passenger. Doc. 97 at 28:10, 50:14–50:21. This inquiry lasted less than a minute, and included routine questions pertaining to the identity of the travelers, travel plans, and ownership of the car:

- How are you?

- Where are [you going]?
- Why [are you going] to New Mexico?
- For how many days [are you going to New Mexico]?
- Who is [the driver]?
- How much time [have you known him]?
- What is [the driver's] name?
- [Whose] car is [this]?

*See* Ex. B at 9–10; Ex. A at 10:49–11:24. During this exchange, the passenger provided answers that conflicted with Defendant's answers about their reason for traveling, length of their stay, and relationship, and that he did not remember Defendant's name. Ex. B at 9–10.

Armijo returned to the patrol car and once again asked Defendant to join him. Ex. A at 11:30; Ex. B at 10. From the time Armijo exited the patrol car to inspect the VIN to his return, just over a minute had passed. *See* Ex. A at 10:25–11:30. Soon after entering the car, Armijo returned Defendant's documents. Ex. A at 11:48. Armijo then completed the warning and had it printed and signed before handing it to Defendant. Ex. A at 14:18. In total, 10 minutes and 38 seconds had elapsed since Armijo started on the citation. Ex. A at 3:40–14:18.

Before Defendant had time to exit the patrol car or was told he was free to leave, Armijo stated that he had questions. Ex. B at 12; Ex. A at 14:19. Armijo asked about Defendant's travels and whether there were drugs, weapons, or cash in the car:

Q: You don't have nothing of illegals in the car?
A: Illegals?
Q: You don't have drugs?
A: No.
Q: You don't have marihuana?
A: No.
Q: Cocaine.
A: No. I don't even smoke or anything like that.
Q: Methamphetamine.
A: No.
Q: Heroin?
A: [unintelligible]
Q: Fentanyl?

4

> A: No, nothing.
> Q: Do you have a lot of money more than ten thousand?
> A: No, all I've got is like two hundred dollars I think, that's all.

Ex. B at 13–14. Then, the following exchange occurred:

> Q: I want to warn your car, is that okay?
> A: Yes that's fine.
> Q: Everything, on inside on outside everything.
> A: Yes that's fine.

Ex. B at 14; Ex. A at 15:30–15:32. Armijo incorrectly used (or mispronounced) *avisar* (to inform, warn, or notify) instead of *revisar* (to review, go through, to check, or inspect). *See avisar* and *revisar*, Cambridge Spanish-English Dictionary, https://dictionary.cambridge.org/dictionary/spanish-english (last visited Dec. 5, 2024). Armijo understood Defendant's response as consent to search the Camry. Doc. 97 at 33:8–36:14. Defendant never sought clarification or objected even after it became obvious that Armijo was about to search the car. *See* Ex. A at 15:30–16:45; Doc. 97 at 35:18–36:14.

Armijo opened the driver side rear-door and almost immediately discovered drugs in an open bag. Ex. A at 16:38–16:46. Later testing confirmed large quantities of cocaine and fentanyl powder. Doc. 42 (laboratory report).

Defendant Salomon-Castro was indicted for entering a conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846, and possession with an intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. Doc. 23 (redacted indictment).[3]

---

[3] Co-defendant Samuel Astorga-Urias has since entered a guilty plea. Doc. 96.

Defendant now moves to suppress all evidence seized from the vehicle during the traffic stop, arguing that the seizure and subsequent warrantless search violated the Fourth Amendment. Doc. 46.

## DISCUSSION

Defendant first argues that the traffic stop turned into an unconstitutional seizure when Armijo inspected the doorjamb VIN and questioned the passenger without reasonable suspicion that further criminal activity was afoot. Doc. 46 a 6–11. Defendant next argues that he did not knowingly and voluntarily consent to a search, and that any consent given was tainted by the Fourth Amendment violation. Doc. 6 at 11–13.

The Court finds that Armijo did not violate Defendant's Fourth Amendment rights by inspecting the doorjamb VIN or questioning the passenger. The Court further finds that Armijo did not unconstitutionally search the vehicle because he obtained Defendant's voluntary consent. Finally, even if Armijo's conduct exceeded his lawful authority and was not justified by reasonable suspicion, the alleged Fourth Amendment violations did not render his consent involuntary, and therefore the exclusionary rule does not apply. As a result, the Court must deny Defendant's motion to suppress evidence.

### I.    Defendant was not unconstitutionally seized because Officer Armijo never exceeded the scope of the initial traffic stop.

Armijo's actions remained within the scope of the initial traffic stop, and as a result, the Court finds that Defendant was not unconstitutionally seized.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment." *United States v. Dawson*, 90 F.4th 1286, 1290 (10th Cir. 2024) (citing

*Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A traffic stop is reasonable if it is (1) "justified at its inception" and (2) remains "reasonably related in scope to 'the mission of the stop itself.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (citing *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015))). An officer can initiate a traffic stop if he observes a traffic violation. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).[4]

"The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But this is not without limit: a traffic stop must "last no longer than is necessary to effectuate the purposes of the stop." *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994). "A traffic stop becomes unlawful . . . 'when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (*i.e.*, adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion.'" *Cates*, 73 F.4th at 805 (citing *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022); *see also Rodriguez*, 575 U.S. at 354–55. "Even *de minimis* delays by unrelated inquiries violate the Fourth Amendment." *Cates*, 73 F.4th at 805 (citing *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020)).

An officer's "mission" during a routine traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *See Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354). This includes "steps necessary to issue a ticket or warning, and 'ordinary inquiries incident to the traffic stop,' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's

---

[4] The parties do not dispute the legality of the initial traffic stop. Neither party contests that Armijo observed Defendant speeding in violation of N.M. Stat. Ann. § 66-7-301(3) (West).

registration and proof of insurance.'" *Cates*, 73 F.4th at 805. "Officers may not 'divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes.'" *Id*. (citing *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020)); *see also Dawson*, 90 F.4th at 1291. However, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 354 ("Authority for the seizure [ends] when tasks tied to the traffic infraction are—or reasonably should have been—completed."). The focus remains on the "reasonableness of [a] traffic stop in light of both the length of the detention and the manner in which it was carried out." *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007); *see generally Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.") (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

Here, neither inspecting the doorjamb VIN nor questioning the passenger unreasonably exceeded the scope of the initial traffic stop. When these acts occurred, Armijo had not yet finished issuing the traffic citation. Ex. A at 10:26–11:24, 14:18; *see Rodriguez*, 575 U.S. at 354. Both actions pertained to the traffic-based mission of the stop and did not unreasonably extend the detention. *See Cates*, 73 F.4th at 805. As a result, the Government is not required to make an additional showing that Armijo reasonably suspected Defendant of drug trafficking or believed any other crime was afoot. *See id*.

A. Doorjamb VIN Inspection

VIN inspections are generally reasonable for ordinary traffic stops, which includes stops for speeding violations, and requires no additional justification. *See New York v. Class*, 475 U.S. 106, 115, 118–19 (1986) ("[A] demand to inspect the VIN, like a demand to see license and

registration papers, is within the scope of police authority pursuant to a traffic violation stop.");
*United States v. Ramos*, 723 F. App'x 632, 636–37 (10th Cir. 2018) (unpublished). In other words,
reasonable suspicion that a separate crime was committed (*e.g.*, that the car was stolen) is not
required to inspect a VIN. *See Class*, 475 U.S. at 114, 118 ("Neither [the VIN inside the doorjamb
nor atop the dashboard are] subject to a reasonable expectation of privacy.").

Indeed, an officer is not limited to doing only what is necessary to issue a speeding citation.
Rather, an officer is allowed to take "steps necessary to issue a ticket" *and* other "ordinary inquiries
incident to a traffic stop." *Cates*, 73 F.4th at 805; *see also Mayville*, 955 F.3d at 830. While an
officer is prohibited from "investigat[ing] ordinary criminal conduct," *see Cates*, 73 F.4th at 805,
a VIN inspection is clearly a traffic-related action. *See Ramos*, 723 F. App'x at 636–37 (citing
*Class*, 475 U.S. at 115, 118–19). The doorjamb VIN inspection is therefore permissible even if
unnecessary or even irrelevant to the speeding citation.

This remains the case even though Armijo had already verified that the dashboard VIN
number matched the registration. Defendant relies extensively on *United States v. Caro*, which
held that "where the dashboard VIN plate is readable from outside the passenger compartment,
that VIN matches the VIN listed on the registration, and there are no signs the plate has been
tampered with, there is insufficient cause for an officer to extend the scope of a detention by
entering a vehicle's passenger compartment for the purpose of further examining any VIN." 248
F.3d 1240, 1246 (10th Cir. 2001). In *United States v. Chavira*, however, the Tenth Circuit
expressly limited *Caro* by explaining that it "applies only when (1) the officer has verified the
dashboard or doorjamb VIN from outside the passenger compartment *and* (2) the officer
nevertheless *physically enters* the passenger compartment to check the VIN." 467 F.3d 1286, 1290
(10th Cir. 2006) (emphasis added). "There is no unlawful detention under *Caro* if the officer

9

remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both." *Chavira*, 467 F.3d at 1290; *see also Ramos*, 723 F. App'x at 637–38 (holding that a doorjamb inspection did not unreasonably prolong a traffic stop despite the officer having already examined the dashboard VIN). In short, a VIN inspection crosses the line from a routine traffic stop activity (requiring no additional justification) to an investigative detour (requiring independent reasonable suspicion) when the officer physically enters the passenger compartment. Here, Armijo never physically entered the cabin. *See* Ex. A at 10:26–11:24.

In response, Defendant argues that, even if the doorjamb inspection was not unconstitutional by itself, it unreasonably prolonged the stop under the circumstances. Doc. 63 at 2. Namely, that this "exceed[ed] the time needed to handle [the speeding citation]." *See Rodriguez*, 575 U.S. at 350; *United States v. Malone*, 10 F.4th 1120, 1123 (10th Cir. 2021) ("[O]fficers cannot take more time than necessary to address the traffic violation."). This argument, however, depends on a VIN inspection not being a routine traffic activity. To conclude that an officer's conduct is limited to only that which is necessary to deal with the specific traffic violation would contravene precedent. *See Cates*, 73 F.4th at 805; *Mayville*, 955 F.3d at 830. Indeed, it necessarily follows from the rule stated in *Chavira* that checking the doorjamb VIN after already verifying the dashboard VIN does not unreasonably prolong a traffic stop. *See* 467 F.3d at 1290.

More generally, in arguing that Armijo's conduct was unreasonable, Defendant places considerable weight on the oft mentioned *de minimis* language. *See Mayville*, 955 F.3d at 829. This language suggests that an unrelated inquiry is *per se* unreasonable even if it extends a stop by a mere second. In practice, however, courts have cast aside this formalist approach and instead assess the traffic stop for general "reasonableness," looking at both the "length of the detention and the manner in which it was carried out." *See Valenzuela*, 494 F.3d at 890; *Jimeno*, 500 U.S. at

250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.") (citing *Katz*, 389 U.S. at 360). Here, the alleged unconstitutional conduct lasted, at most, 1 minute, Ex. A at 10:26–11:24, and never caused the traffic stop to devolve into a contentious situation. An ordinary person would not find this unreasonable.

### B. Passenger Questioning

Armijo's questions to the passenger while purportedly inspecting the doorjamb VIN did not unreasonably prolong the stop or otherwise result in an unlawful seizure. During a routine traffic stop, an officer can "legitimately ask questions relating to the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving, regardless of [the officer's] underlying motivation." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *see also United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *United States v. Moore*, 795 F.3d 1224, 1228–29 (10th Cir. 2015); *United States v. Jackson*, 235 F. App'x 707, 710 (10th Cir. 2007) (unpublished) ("Our precedent explicitly and repeatedly affirms the right of an officer to question both the driver and her passenger as part of a routine traffic stop."). "Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *United States v. Simpson*, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010) (citing *Wilson v. Sirmons*, 536 F.3d 1064, 1110 (10th Cir. 2008)); *see also United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) ("Even if [writing the warning ticket] might have been performed slightly faster had [the officer] not been asking questions, the time involved was not 'beyond the time reasonably required to complete that task.'"); *Valenzuela*, 494 F.3d at 890 ("That [the officer] did not ask the question while actively processing [the defendant's] traffic infraction does not render [the defendant's] momentary detention unreasonable.").

11

After opening the door to check the doorjamb VIN, Armijo asked the passenger the following questions:

- How are you?
- Where are [you going]?
- Why [are you going] to New Mexico?
- For how many days [are you going to New Mexico]?
- Who is [the driver]?
- How much time [have you known him]?
- What is [the driver's] name?
- [Whose] car is [this]?

Ex. B at 9–10. These are all routine questions pertaining to "the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving." *See Rivera*, 867 F.2d at 1263. For the purposes of this inquiry, it is irrelevant whether Armijo was asking these questions solely to identify inconsistencies in Defendant's story. *See id.* (an officer can "legitimately ask questions relating to the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving, regardless of [the officer's] underlying motivation").

The questioning did not unreasonably or excessively prolong the traffic stop. *See Simpson*, 609 F.3d at 1146 n.1; *Kitchell*, 653 F.3d at 1217; *Alcaraz-Arellano*, 441 F.3d at 1259; *Valenzuela*, 494 F.3d at 890. The entire encounter lasted around 1 minute. Ex. A at 10:46–11:24. Defendant does not suggest that spending another minute on the traffic citation would be "beyond the time reasonably required to complete that task." *See Alcaraz-Arellano*, 441 F.3d at 1252. And it is immaterial that Armijo was not actively processing the speeding citation while questioning the passenger. *See Valenzuela*, 494 F.3d at 890. In short, Armijo's questioning did not violate the Fourth Amendment.

II.    **Armijo had reasonable suspicion to extend the traffic stop**.

As established *supra*, neither inspecting the doorjamb VIN nor questioning the passenger exceeded the scope of the initial traffic stop. Even if it did, Armijo had reasonable suspicion to extend the traffic stop's scope and investigate further.

To constitutionally justify a detention beyond the scope and temporal limits of the initial traffic stop, the government must demonstrate that "the officer has an objectively reasonable and articulable suspicion that [further] illegal activity has occurred or is occurring" or that the "traffic stop has become a consensual encounter." *Caro*, 248 F.3d at 1244; *see also Sandoval*, 29 F.3d at 540. "The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; [rather,] 'common sense and ordinary human experience must govern over rigid criteria.'" *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

Reasonable suspicion exists if an officer has "a particularized and objective basis for suspecting the [defendant] of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quotations omitted). Though the "government bears the burden of demonstrating the reasonableness of the suspicion," it "is not an onerous standard." *United States v. Cortez*, 965 F.3d 827, 834 (10th Cir. 2020). The "level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (citation and internal quotation marks omitted). "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (Gorsuch, J.) (citations and internal quotations omitted). "Reasonable suspicion can be shown by evidence that is inherently less

13

reliable in kind than the sort of evidence needed to establish probable cause." *Id.* (citations omitted).

"The existence of objectively reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality of the circumstances.'" *Simpson*, 609 F.3d at 1146 (citing *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)). "A factor may raise objectively reasonable suspicions 'even if it is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'" *Id.* (citing *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 9 (1989))).

The Court finds that, considering the totality of the circumstances, Armijo had "a particularized and objective basis" to suspect that Defendant was engaged in further criminal activity. *See Ornelas*, 517 U.S. at 696.[5] To support this suspicion, the government points to four facts made known to Armijo prior to inspecting the doorjamb VIN: the car was registered to and insured by absent third parties; the car was recently registered; Defendant provided vague and evasive answers regarding his travel plans; and Defendant lacked knowledge about his passenger despite having worked together for an extended period. Doc. 59 at 11. While the asserted bases appear largely innocuous to an ordinary person, the court gives "deference to trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997); *see also Simpson*, 609 F.3d at 1146; *Esquivel-Rios*, 725 F.3d at 1236. Indeed, Armijo has received considerable narcotics and criminal interdiction training in addition to having extensive experience conducting interdiction seizures and patrolling areas rife with drug smuggling. Doc. 97 at 5:13–10:11.

---

[5] The Court only considers Armijo's observations that occurred before prior to engaging in the allegedly unconstitutional conduct.

The Court finds that the facts relied on sufficiently demonstrate the reasonableness of Armijo's suspicion and justify a limited investigative detour. *See Cortez*, 965 F.3d at 834; *White*, 584 F.3d at 950; *Esquivel-Rios*, 725 F.3d at 1236.

A. Vehicle Registered to and Insured by Absent Third Parties

Armijo's observation that the Camry was registered to and insured by absent third parties gives rise to reasonable suspicion. Armijo testified that in his experience, such discrepancies between the occupants and documents raises a red flag. Doc. 97 at 10:4–10:11, 18:7–19:11. The Tenth Circuit has previously noted that "driving a vehicle registered to a third party who wasn't present" is a factor "often held" to "indicate a stolen vehicle or drug trafficking." *United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (citations and internal quotations omitted) (cleaned up). The Court expressly rejected the notion that "this factor becomes relevant only when the driver cannot provide details about the owner." *See id*. Rather, "it [is] enough to contribute to reasonable suspicion that the 'defendant was driving a car that was not registered to him or to his passenger.'" *Id.* (citing *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991)). It is clear, therefore, that "this factor is at least relevant to the reasonable suspicion analysis" notwithstanding Defendant providing details about the registered owner. *See id*.

B. Recently and Temporarily Registered Vehicle

A vehicle's recent and temporary registration further contributes to reasonable suspicion. Ex. E (Arizona *Temporary* Registration). In Armijo's training and experience, a temporary registration obtained shortly before a trip raises red flags. Doc. 97 at 19:5–19:17. The Tenth Circuit recognizes this intuition, finding that "[t]he recent registration of a vehicle can contribute to reasonable suspicion." *See Moore*, 795 F.3d at 1230 (citing *United States v. Berrelleza*, 90 F.

App'x 361, 364 (10th Cir. 2004) (unpublished) ("[I]t is common for drug cartels to supply a courier

with a high mileage vehicle that has only recently been registered and insured.")).

    C.  <u>Vague and Evasive Answers</u>

        Defendant's vague and evasive answers in response to questions about his travel plans

contributes to reasonable suspicion. While confusion about details and somewhat vague answers

are not given "much independent weight," such answers are still relevant. *See United States v.*

*Santos*, 403 F.3d 1120, 1131 (10th Cir. 2005).

        Armijo found Defendant's inability to identify precisely where in New Mexico he was

heading to be suspicious. Doc. 97 at 9:25–10:11.

> Q (Armijo): Where are we going from to?
> A (Defendant): New Mexico.
> Q: Where in New Mexico?
> A: Up ahead here.
> . . .
> Q: But, I don't know where here in New Mexico?
> A: Excuse me?
> Q: Don't, I don't know where here in New Mexico?
> A: What do you mean?
> Q: Here in New Mexico, where? Where work?
> A: Oh, no, up ahead, well, New Mexico.
> Q: Where?
> A: No, well, excuse me [unintelligible] the location, you know.

Ex. B at 3–4. The inability to identify a precise destination supports reasonable suspicion. *See,*

*e.g.*, *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir. 1995) (finding reasonable suspicion

where, among other things, the defendant was "uncertain[ ] as to where in North Carolina he was

going"); *United States v. Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008) (unpublished)

("We have found similar situations, in which the driver's particular destination was unknown or

could not be pinpointed, to contribute to the reasonable suspicion of an experienced officer.").

Armijo's suspicions were again heightened when Defendant continued to give limited and vague answers in response to questions regarding the length and purpose of his travels. Doc. 97 at 10:4–10:11, 29:5–29:18.

> Q: Why I go to . . . New Mexico?
> A: Uh, we're going to work.
> Q: Work. Where?
> A: Well we just contra-, this [unintelligible] and one, we're going to do carpeting.
> Q: Okay. For how many days work?
> A: Well, I think it's a month.

Ex. B at 3–4. As Armijo continued to inquire about travel details, Defendant repeatedly failed to give more specific answers. Ex. B at 4. The Tenth Circuit has found vague or evasive answers to support reasonable suspicion. *See, e.g.*, *Simpson*, 609 F.3d at 1150 ("[T]he court has found vague, inconsistent[,] or evasive answers with respect to travel plans supportive of reasonable suspicion."); *United States v. Karam*, 496 F.3d 1157, 1164–65 (10th Cir. 2007) (defendant was "less than clear when answering [the officer's] questions about his travel plans"). This is because "[c]onfusion about details is often an indication that a story is being fabricated on the spot." *Santos*, 403 F.3d at 1131 (vague answers concerning length of stay).

While relevant, the Court does not give this factor much weight. As Defendant notes, he was not equivocating about the exact timeline for his trip. Doc. 63 at 4. To the extent that the answers were vague or evasive, Defendant contributes such responses to Armijo's rudimentary Spanish. Doc. 63 at 4. Indeed, much of the translation is unclear and requires a reader (much less a listener) to pause before understanding what is being asked. This could explain why Defendant continually failed to give a more specific answer about his destination. Still, it is reasonable that an officer in Armijo's position would be suspicious.

17

D.  Lacking Knowledge About a Passenger

Defendant's inability to state his passengers last name, in conjunction with the fact that Defendant purportedly worked with the passenger, had known him for at least a month, and travelled in the same car for a considerable distance, contributes to reasonable suspicion:

> Q: What is the other person in the car?
> . . .
> A: A work mate.
> Q: What is his name?
> A: Samuel.
> Q: Samuel what?
> A: Uh, I couldn't tell you. A work mate.
> Q: How long do I know him?
> A: Well, at work, it's been like a month, knowing each other.

Ex. B at 4–5. Though binding authority is lacking for this specific factor, Armijo testified that based on his training and experience, it was suspicious that a driver would not know a co-worker's name under the circumstances. Doc. 97 at 22:10–23:8, 29:10–29:18. The Court finds his suspicion reasonable. *See generally Neff*, 300 F.3d at 1220 ("Common sense and ordinary human experience must govern over rigid criteria.").

**III.    Defendant voluntarily consented to the vehicle search**.

Defendant voluntarily consented to a search of his vehicle. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) ("An officer may conduct a warrantless search of a vehicle without violating the Fourth Amendment if the person in control of the vehicle voluntarily consents to the search."). For a search by voluntary consent to be valid, the government must prove that "(1) the law enforcement officers [received] express or implied consent, and (2) that consent [was] freely and voluntarily given." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (citations omitted); *see also Schneckloth*, 412 U.S. at 222. At issue is the following exchange:

18

Q: You don't have nothing of illegals in the car?
A: Illegals?
Q: You don't have drugs?
A: No.
Q: You don't have marihuana?
A: No.
Q: Cocaine.
A: No. I don't even smoke or anything like that.
Q: Methamphetamine.
A: No.
Q: Heroin?
A: [unintelligible]
Q: Fentanyl?
A: No, nothing.
Q: Do you have a lot of money more than ten thousand?
A: No, all I've got is like two hundred dollars I think, that's all.
Q: **I want to warn your car, is that okay?**
A: **Yes that's fine.**
Q: **Everything, on inside on outside everything.**
A: **Yes that's fine**.

Ex. B at 13–14; Ex. A at 15:09–15:32. Defendant asserts that Armijo's broken Spanish made it impossible to understand that Armijo was asking for his consent to search the car, thereby preventing his consent. Doc. 46 at 12. Namely, that Armijo used *avisar* (to inform, warn, or notify) instead of *revisar* (to review, go through, to check, or inspect). *See avisar* and *revisar*, Cambridge Spanish-English Dictionary, https://dictionary.cambridge.org/dictionary/spanish-english (last visited Dec. 5, 2024). The Court finds, however, that both prongs are met.

    A.  <u>Express Consent</u>

    The Court finds that Armijo's solicitations and Defendant's affirmative responses were sufficiently clear to cause an officer in Armijo's position to reasonably believe that consent to a search was given. *See United States v. Guerrero*, 472 F.3d 784, 789–90 (10th Cir. 2007) ("To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear . . . ."); *Jones*, 701 F.3d at 1321 (referencing *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998) ("[W]hether or not the suspect has actually consented to the search, the Fourth Amendment

requires only that the police reasonably believe the search to be consensual.")); *United States v. Lopez-Carillo*, 536 F. App'x 762, 768 (10th Cir. 2013) (unpublished) ("The focus is not whether [one] subjectively consented, but rather, whether a reasonable officer would believe consent was given . . ." (citation and internal quotations omitted)).

Armijo's accidental use of the wrong word does not prevent his belief from being reasonable. The Fourth Amendment does not require statements to be analyzed in a vacuum. And here, context matters. Throughout the traffic stop, Defendant repeatedly asked for clarification when he did not understand what Armijo was asking. Ex. B. at 2–6, 8, 13, 15 (Defendant saying "mande" ("excuse me") in response to various questions); Doc. 97 at 23:20–24:15. At no point did Defendant voice his confusion, despite having done so before, or object to the search after it commenced. Ex. A at 15:30–16:45; Doc. 97 at 35:10–36:14. It is reasonable to expect that, if Defendant was confused about Armijo's request to search his vehicle, he would have brought it to his attention. Doc. 97 at 14:18–15:2, 23:20–24:15. Furthermore, the dialogue immediately before and after consent was given clearly expressed Armijo's interest in checking whether drugs were in the car. Ex. B at 13–15. Defendant never sought clarification or objected even after it became obvious that Armijo was about to search the car. Ex. A at 15:30–16:45. And, considering Defendant responded "yes that's fine" twice, it is unclear what else he could have thought he was responding to. This is sufficient for a reasonable person in Armijo's place to believe that Defendant understood what was being asked. *See, e.g.*, *United States v. Cedano-Medina*, 366 F.3d 682, 686–87 (8th Cir. 2004) (affirming district court's finding of voluntary consent notwithstanding a language-barrier).

Defendant responding by saying "yes that's fine" to Armijo's successive questions is a clear and unequivocal affirmative response. *See United States v. Dewitt*, 946 F.2d 1497, 1500 (10th

Cir. 1991); *United States v. Blackburn*, 64 F. App'x 190, 195–96 (10th Cir. 2003) (unpublished). Taken together, the first prong is met.

   B. <u>Freely and Voluntarily Given</u>

   The Court finds that, from the totality of the circumstances, Defendant's consent was freely and voluntarily given. *See Jones*, 701 F.3d at 1317–18 ("[The second prong] requires that 'a consent not be coerced, by explicit or implicit means, by implied threat or covert force.'" (citing *Schneckloth*, 412 U.S. at 228)); *United States v. Price*, 925 F.2d 1268, 1271 (10th Cir. 1991) ("The voluntariness of consent always must be determined from the totality of the circumstances."). The inquiry into whether Defendant's consent was freely and voluntarily given focuses on classic coercion: Whether "the defendant suffered . . . 'physical mistreatment, use of violence or threats of violence or threats of violence, promises or inducements, deception or trickery." *See United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (citation and internal quotations omitted).

   Classic coercion is absent in this case. Defendant does not allege that he was physically mistreated, threatened, or induced. To the contrary, the body cam footage and transcript reveal that Armijo and Defendant had a calm and professional conversation up until narcotics were discovered. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006); *Olivares-Campos*, 276 F. App'x at 824. Armijo never brandished his weapon, exerted physical force, or used aggressive language. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). While the conversation took place in Armijo's vehicle to escape the cold, Ex. B at 3, it never began to resemble a coercive environment. *See Ledesma*, 447 F.3d at 1314; *Olivares-Campos*, 276 F. App'x at 824. Defendant does not allege, nor does testimony indicate, that Armijo intentionally used *avisar* instead of *revisar* to induce, trick, or deceive him into consenting.

21

On the other hand, being in a patrol car when asked to consent to a search, even if the request and preceding conversation were cordial and non-threatening, could still cause a reasonable person to believe they have no choice but to cede to the officer's request under certain circumstances. *See Sanchez*, 89 F.3d at 718 (a factor "that could lead a reasonable innocent person to believe that he is not free to disregard the police officer [includes] . . . interaction in a nonpublic place or a small, enclosed space"). This is not a case, however, where an officer continued to possess a defendant's documents. Ex. A at 11:48; *see Ledesma*, 447 F.3d at 1314. It is also true that, while Armijo did not explicitly inform Defendant that he was free to leave, handing over a citation and saying, "that's all, okay," Ex. B at 12, would cause a reasonable person to feel free to end the encounter. *See Ledesma*, 447 F.3d at 1314–15 ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter [and] afford a defendant an opportunity to depart."); *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) ("If the driver voluntarily consents to additional questioning, he is no longer seized for purposes of the Fourth Amendment because he is free to leave." (citation omitted)). On balance, the Court cannot conclude that the environment was coercive. *See Taverna*, 348 F.3d at 879 (holding that consent to search while driver was in a patrol car was voluntary); *United States v. Villegas*, 634 F. App'x 625, 631 (10th Cir. 2015) (unpublished) ("[Defendant's] presence with [an officer] in the police vehicle did not make her consent involuntary.").

The fact that Defendant was not informed that he could withhold consent to search does not change the outcome. The Tenth Circuit has made clear that police need not "always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *United States v. Drayton*, 536 U.S. 194, 206 (2002); *see also United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) ("[T]he officer's failure to advise [the defendant] should carry little

weight in our analysis."). This remains true even if "the consenting party is being detained at the time consent is given." *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997) (citations omitted).

**IV.    The exclusionary rule does not apply**.

Even if the Court assumes *arguendo* that Defendant's consent was preceded by an illegal seizure, the consent remained voluntary in fact.[6] As a result, the exclusionary rule does not apply to the evidence discovered in the Camry.

Under the exclusionary rule, evidence obtained through an unconstitutional search is inadmissible unless an exception applies. *Mapp v. Ohio*, 367 U.S. 643, 655–58 (1961); *see also United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018). One such exception is the doctrine of tainted consent. "If a consensual search is preceded by a Fourth Amendment violation, the government must prove both the voluntariness of the consent under the totality of the circumstances and that there was a break in the casual connection between the illegality and the evidence obtained." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) (citing *Melendez-Garcia*, 28 F.3d at 1054). The government must "demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because [courts are] concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule." *Melendez-Garcia*, 28 F.3d at 1054; *see also United States v.*

---

[6] In the government's response brief, it argues that the exclusionary rule does not apply under the attenuation doctrine. Doc. 59 at 15–17. The issue here, however, is more accurately referred to as tainted consent. This is because finding that Defendant voluntarily consented to the vehicle search is a necessary condition to maintaining the evidence discovered in the car. Still, the doctrines have identical three-factor tests, and if the requisite connection is established, lead to the same result. *Compare Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (tainted consent), *with Utah v. Strieff*, 579 U.S. 232, 239 (2016) (attenuation doctrine).

*Shrum*, 908 F.3d 1219, 1233–34 (10th Cir. 2018) ("The fruit of the poisonous tree doctrine may also extend to invalidate consents which are voluntary in the traditional sense." (cleaned up)).

On balance, the Court finds that Defendant's consent was not made involuntary by any preceding unconstitutional seizure. Three factors are relevant to determine whether a consent is tainted by a preceding illegal seizure: "(1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances; and *particularly* (3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054 (citing *Brown v. Illinois*, 422 U.S. 590, 603–604 (1975)) (emphasis added). The purpose of the inquiry is to ensure that the "consent was 'sufficiently an act of free will . . . .'" *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). While the first factor weighs against the consent being voluntary, the second factor does not go strongly in either direction, and the final, most important factor support its voluntariness and counsels against exclusion.

Temporal proximity. Armijo's request and Defendant's consent to search occurred just over a minute after the citation was completed and handed over. Ex. A at 14:18–15:32; *see Shrum*, 908 F.3d at 1235–36 (citing *Strieff*, 579 U.S. at 239). This factor goes in Defendant's favor.

Intervening circumstances. After the illegal seizure ended and before Defendant consented to the search, Armijo returned Defendant's documents and informed him that he required nothing more. Ex. B at 12; Ex. A at 11:48. Though short in time, this interaction arguably "create[d] a discontinuity between the illegal stop and the consent such that the original illegality is weakened and attenuated" because it notified Defendant that the object of the traffic stop was complete. *See United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996); *United States v. Recalde*, 761 F.2d 1448, 1458–59 (10th Cir. 1985). On the other hand, Armijo obtained Defendant's consent before he had a chance to exit the patrol car. It is arguable, therefore, that merely informing Defendant

that the traffic citation was complete insufficiently "isolate[d] the defendant from the coercive effects of the original illegal stop." *See Gregory*, 79 F.3d at 980. In short, this factor does not weigh heavily in either direction.

Purpose and flagrancy. Even if Armijo violated the Fourth Amendment by inspecting the doorjamb VIN or questioning the passenger, such misconduct was neither purposeful nor flagrant. *See Melendez-Garcia*, 28 F.3d at 1054; *Strieff*, 579 U.S. at 241 ("The third factor . . . reflects [the exclusionary rule] rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant."). "[P]urposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nonetheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) (citations and internal quotations omitted).

If Armijo's conduct was unconstitutional, it certainly was not obvious. *See supra* section I. Nothing indicates that Armijo knew his conduct was unconstitutional; to the contrary, he acknowledged *New York v. Class* by name while testifying. Doc. 97 at 44:19–44:20 ("[B]ased off *New York v. Class*, I am able to open the door to check the VIN."). While Defendant alleges that Armijo impermissibly expanded the traffic stop, there is no dispute that it was justified at its inception *Cf. Fox*, 600 F.3d at 1261–62 ("[I]t may be significant that the 'officers ha[d] no right whatsoever to detain the person from whom consent is sought.'" (citations omitted)). Although Armijo's actions were arguably "investigatory in design and purpose and executed in the hope that something might turn up," *see id.* at 1261, this is not a situation where the officer used a sham inspection to ask impermissibly probing questions.

This was, at most, an ordinary, isolated negligent act. *See Davis v. United States*, 564 U.S. 229, 238 (2011) ("When the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force." (cleaned up)). Only when "the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights [does] the deterrent value of exclusion . . . outweigh the resulting costs." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)). In short, concluding that Defendant's consent was rendered involuntary under these circumstances and excluding this evidence would hardly deter future police misconduct. *See Strieff*, 579 U.S. at 241; *Davis*, 564 U.S. at 238.

On balance, the Court finds that the exclusionary rule does not apply. *See Melendez-Garcia*, 28 F.3d at 1054.

## CONCLUSION

In sum, Armijo did not violate Defendant's Fourth Amendment rights by inspecting the doorjamb VIN or questioning the passenger, or by searching Defendant's vehicle. Even if Armijo's conduct exceeded his lawful authority and was not justified by reasonable suspicion, the Fourth Amendment violations here did not render his consent involuntary, and therefore the exclusionary rule does not apply. Accordingly, Defendant's motion to suppress evidence, Doc. 46, is **DENIED**.

      **SO ORDERED**.


_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE